IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 26, 2005

## CAROLYN WOOSTER v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Dickson County**
**No. CR- 6603   Robert E. Burch, Judge**

---

**No. M2005-01217-CCA-R3-PC - Filed December 12, 2005**

---

A Dickson County jury convicted the Petitioner, Carolyn Wooster, of aggravated child abuse and neglect and she was sentenced to fifteen years in prison. This court affirmed the conviction on direct appeal and the Tennessee Supreme Court denied review. The Petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel, and the post-conviction court dismissed her petition. The Petitioner appeals, contending that her trial counsel rendered ineffective assistance of counsel at trial by failing to adequately investigate her case. After thoroughly reviewing the record and the applicable law, we conclude that there exists no reversible error. Accordingly, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JJ., joined.

Geoffrey Coston, Franklin, Tennessee for the Appellant, Carolyn Wooster

Paul G. Summers, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Suzanne M. Lockert, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION
### I. Facts

#### A. Facts on Direct Appeal

On direct appeal, this Court affirmed the Petitioner's convictions and sentence. In our opinion, we summarized the facts as follows:

At approximately 7:00 A.M. on March 5, 1998, the [Petitioner] brought the victim, a newborn girl, to Horizon Medical Center in Dickson. The defendant explained that she had given birth at home the night before and desired to offer the

infant for adoption.

Dr. Valerie Beck, a pediatrician at Horizon Medical Center, examined the infant in the labor and delivery area at about 7:15 A.M. Because the victim's heart rate was only about 70 beats per minute, Dr. Beck classified the victim's condition as critical. She explained that a newly born, crying infant should have a heart rate of between 130 and 140 beats per minute. Dr. Beck observed that the victim was cyanotic and grunting, indicating that the victim was in distress. She determined that there was a substantial risk of death.

At trial, Dr. Beck testified that the low heart rate was due to a low body temperature. According to Dr. Beck, the heart rate drops when exposed to cold temperatures, impairing the heart's ability to operate correctly. When neither a digital thermometer or a glass thermometer registered a body temperature, Dr. Beck made a diagnosis of severe hypothermia. The victim was placed under a radiant warmer with heated saline bags wrapped in warm towels to raise her temperature. By 7:40 A.M., the baby's temperature had risen to 97 degrees.

Helen Murphy, a registered nurse testified that the defendant claimed that she had given birth at her home on the previous evening and had been assisted by her boyfriend and two nurses. According to Ms. Murphy, the defendant claimed that she had visited an obstetrician on six separate occasions before moving to Tennessee. The defendant informed Ms. Murphy that her water had broken between 10:30 and 11:00 P.M. and that her contractions began immediately thereafter. She explained that she came to the hospital in order to offer the infant for adoption. Because the defendant claimed that she was not experiencing any bleeding, Ms. Murphy initially suspected that the defendant might not have given birth to the baby. Because her suspicions were further aroused when she discovered that the defendant was not producing breast milk and had declined a physical examination, Ms. Murphy asked the Dickson Police Department to investigate.

Later, the defendant consented to a physical examination. After being examined, she was interviewed by Detective Mike Fleaner of the Dickson Police Department and Rosie Skinner of the Department of Children's Services. The defendant again claimed that she had given birth at home and that her boyfriend and two nurses had assisted in the delivery. During the interview, the defendant expressed particular concern about being late for work.

After interviewing the defendant, Detective Fleaner and Ms. Skinner traveled to the defendant's residence to question her boyfriend, Jason Huler. According to Detective Fleaner, Huler stated that he was unaware that the defendant was pregnant and had not helped in any delivery. After interviewing Huler, Detective Fleaner drove to the defendant's place of employment and questioned her a second time.

When he arrived, the defendant was in her vehicle, a camper, which was parked in her employer's lot.

After receiving permission to search the camper, Detective Fleaner found a shirt that the defendant had used to clean the infant. Upon further examination at the police department, the defendant admitted that she was alone at the time of birth, and had placed the victim under the house during the course of the night.

At trial, the defendant confirmed that she was alone when she gave birth to a baby girl at her home at approximately 6:20 P.M. on March 4, 1998. According to the defendant, her water broke two and a half days before the delivery. She held and breast fed the baby until about 10:00 P.M., when her boyfriend, who was unaware of her pregnancy, was scheduled to return from work. The defendant stated that she wrapped the infant in a shirt, placed her in a cardboard box, covered her with two towels, and then placed the box in a storage area underneath her house.

The defendant acknowledged that she heard the baby cry around 1:00 A.M., but did not check on her. After hearing whimpering at 4:00 A.M., the defendant claimed that she went to the storage area, held the infant for a few minutes, and then placed her back in the box. Even though she detected that the infant was cold, the defendant conceded that she returned to the house, leaving the baby outside. The defendant estimated that about one and a half hours later, she came back to the baby and took her into a camper that was parked outside. The defendant testified that she cleaned the baby and attempted to breast feed her while in the camper. She stated that when the baby would not nurse, she took the infant into her residence and at 6:45 A.M., she drove her to Horizon Medical Center.

State v. Carolyn A. Wooster, No.M2000-02992-CCA-R3-CD, 2003 WL 440233, at *1-2 (Tenn. Crim. App., at Nashville, Mar. 18, 2002), *perm. app. denied* (Tenn. Sept. 23, 2003).

At trial, Detective Fleaner testified that he called the National Weather Service in order to obtain the temperature for March 4, 1998, and the National Weather Service reported that the temperature was 31 degrees at the Nashville airport. Trial counsel told the trial court judge that he had not anticipated any testimony about the temperature for the night in question and would need time to rebut the officer's testimony. The trial court observed that "most prudent lawyers would have anticipated that the temperature on this date would have been an issue and would have come prepared to prove it if they thought it was going to be required." Trial counsel said that he called the National Weather Service in Nashville, and they said the temperature was 47 degrees on March 4, 1998, but that he did not have any proof to offer into evidence. The trial court judge told trial counsel that he could bring in evidence about the temperature on the following day of trial. The trial court noted that "I think either temperature would probably be inappropriate to leave a newly born infant outside in. This child didn't freeze to death. This child was cold. It's body temperature was low. I think either one would do that."

-3-

## B. Post-conviction Facts

A copy of the post-conviction hearing transcript is not in the record on appeal before this Court. It is the duty of the appellant to provide a record which conveys a fair, accurate, and complete account of what transpired with regard to the issues which form the basis of the appeal. See Tenn. R. App. P. 24(b); see State v.. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). Normally, when presented with an inadequate record on appeal, this Court must presume that the trial court ruled correctly. See State v. Ivy, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). Under the circumstances of this case, however, we believe the absence of the transcript of the post-conviction court's hearing is not fatal to appellate review. We find that the record is sufficient to determine the issues raised on appeal. Thus, we will review the issues on the merits.

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). Absent a record which would indicate otherwise, we must presume that the findings of the post-conviction court are correct. According to the post-conviction court's findings, at the post-conviction hearing, the Petitioner's trial counsel testified that he did not contest the actual temperature on the night that the baby was kept under the house and that he did not know why he did not investigate this issue. According to the detailed memorandum opinion filed by the post-conviction court, trial counsel also seemingly testified that his trial tactic was to "show that [the Petitioner] was a good person."

## II. Analysis

On appeal, the Petitioner contends that, because her trial counsel was ineffective, the post conviction-court erred when it dismissed her petition. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999); Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. Burns, 6 S.W.3d at 461.

The right of a criminally accused to representation is guaranteed by both the Sixth

Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. State v. White, 114 S.W.3d 469, 475 (Tenn. 2003); Burns, 6 S.W.3d at 461; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. The following two-prong test directs a court's evaluation of a claim for effectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

State v. Melson, 772 S.W.2d 417, 419 (Tenn. 1989). To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Strickland v. Washington, 466 U.S. 668 (1984)). When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988).

The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Finally, we note that criminal petitioners are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665, n.38 (1984)).

Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. House, 44 S.W.3d at 515 (citation omitted); Thomas Brandon Booker v. State, No. W2003-00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim. App., at Jackson, Mar. 24, 2004), perm. app. denied (Tenn. 2004). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. House, 44 S.W.3d at 515.

In order to render effective assistance, counsel must make all reasonable investigations

relevant to the case or must make a reasonable decision that renders particular investigations unnecessary. Burns, 6 S.W.3d at 462. However, "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. Failure to conduct a reasonable investigation constitutes deficient performance. Id.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

On appeal, the Petitioner claims that her trial counsel failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, she asserts that she was denied the effective assistance of counsel because Counsel failed to adequately investigate her case and to present, at trial, evidence about the temperature on the night of the crime. The Petitioner asserts that Counsel's deficient performance undermines confidence in the outcome of her trial because the State needed to show that the baby was exposed to extremely cold temperatures in order to establish a link between the Petitioner's conduct and the baby's injury. The Petitioner also contends that Counsel's conduct prejudiced the Petitioner's case because the issue of temperature was essential to proving that the Petitioner knowingly exposed the child to the risk of substantial bodily injury. The State asserts that the Petitioner failed to demonstrate that her Counsel's performance was deficient and failed to show how any alleged errors constituted prejudice sufficient to undermine confidence in the outcome of her jury trial. We agree with the State.

In its opinion, the post-conviction court stated that:

Assuming for the purposes of argument that trial counsel's performance was deficient in failing to establish that the actual temperature was some sixteen degrees warmer than that presented in the State's proof, Petitioner must still establish that actual prejudice to Petitioner was caused by the deficient performance . . . .

At Petitioner's trial, Dr. Valerie Beck testified that the baby's body temperature was so low that it could not be measured by the instruments available. Dr. Beck testified that the baby was suffering from severe hypothermia. She further testified that, when placed in a warm environment, the baby's body temperature rose to 97 degrees in fewer than thirty minutes. Dr. Beck testified that the baby was in acute distress and that there was a substantial risk of death from this condition. This being the case, it matters little whether the outside temperature was sixteen degrees

warmer or not. The fact is that, whatever the temperature, the baby was in imminent danger of death from hypothermia. . . .

Certainly, Petitioner was aware of [what] the outside temperature was, at most, in the forties and that this situation would be dangerous to the health of a newborn. To say that Petitioner did not act knowingly in this situation, whether the temperature was in the 20's or 40's, defies logic.

No prejudicial deficiency in the investigation of Petitioner's trial counsel has been shown by the proof. The issue is without merit.

The evidence in the record does not preponderate against the findings of the post-conviction court. Although, as previously noted, the transcript of the evidence at the post-conviction hearing is not included in the record on appeal, it would appear from the memorandum opinion filed by the post-conviction court that the Petitioner presented no evidence to establish that Counsel's alleged failure to investigate the temperature on the night in question undermined confidence in the outcome of her trial. Even if the temperature was 47 degrees on the night of the crime, it is nonetheless abundantly clear in our view that the Petitioner subjected her baby to abuse and neglect by leaving the baby outside overnight. Whether the temperature was 31 degrees or 47 degrees, the baby's body temperature became too cold, and the baby developed hypothermia due to the Petitioner's actions. We conclude, as did the post-conviction court, that any alleged deficient representation by counsel does not undermine our confidence in the jury's determination that the Petitioner knowingly subjected her baby to the risk of serious bodily injury and imminent danger of death. Therefore, the Petitioner is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE